IN THE UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF LOUISIANA

**PHILLIS SCAFIDEL, ROBERT SCAFIDEL, JR. AND RYAN SCAFIDEL ON BEHALF OF ROBERT J. SCAFIDEL, SR.**

Case No.:

*JURY* TRIAL DEMANDED

*Plaintiff*

**V
SYNGENTA CROP PROTECTION LLC, SYNGENTA AG, and CHEVRON USA, INC.**

*Defendants*

## COMPLAINT

Plaintiffs, **PHILLIS SCAFIDEL, ROBERT SCAFIDEL, JR., AND RYAN SCAFIDEL**, **on behalf of Robert Scafidel,Sr.,** by and through undersigned counsel, brings this civil action for damages against Defendants Syngenta AG, Synegenta Crop Protection LLC, and Chevron U. S.A., Inc., and alleges as follows:

## INTRODUCTION

1. Paraquat, known as paraquat dichloride (EPA Chemical Code 06101) or Paraquat methosulfate (EPA Chemical Compound 061602), is a synthetic chemical compound bearing EPA Chemical Code 06101 that since the early 1960s has developed, registered, manufactured, distributed, sold for use, and used as an active ingredient in certain herbicide products ("Paraquat Products") developed, registered, formulated, distributed, and sold for use in the United States under the brand names Starfire, Cyclone, Bonedry, Firestorm, Helmquat, Devour, Bonfire, Crisquat, Sweep, Blanco, Gramoxone, Ortho Paraquat CL, and Ortho Dual Paraquat, among others.

2. Plaintiff brings this action against the Defendants to recover damages for personal injuries and other economic damages resulting from his exposure to Paraquat Products over many

years at various places in the State of Louisiana, including Orleans Parish and Jefferson Parish.

3. Defendants are companies and successors-in-interest to companies that designed, manufactured, distributed, and sold Paraquat Products for use in Louisiana, and/or acted in concert with others who designed, manufactured, distributed, and sold Paraquat Products for use in Louisiana.

4. Plaintiff brings this action against the Defendants to recover damages for personal injuries and other economic damages resulting from his exposure to Paraquat Products over many years at various places in the State of Louisiana, including Orleans Parish and Jefferson Parish.

5. Defendants are companies and successors-in-interest to companies that designed, manufactured, distributed, and sold Paraquat Products for use in Louisiana, and/or acted in concert with others who designed, manufactured, distributed, and sold Paraquat Products for use in Louisiana.

## **PARTIES**

### A. **Plaintiff**

6. Plaintiffs, Phillis Scafidel, Robert Scafidel, Jr., and Ryan Scafidel, on behalf of Robert J. Scafidel, Sr. are citizens and residents of the State of Louisiana and the Parishes of St. Tammany, St. Tammany and Orleans respectively. They are the surviving spouse and natural born sons of Robert Scafidel, Sr. who died December 16, 2021 from Parkinson's disease ("Parkinson's") caused by his exposure to Paraquat Products at various places within the State of Louisiana generally, and Parishes within the Eastern District of Louisiana, including St. Tammany and St. Bernard.

7. Plaintiff used Defendants' Paraquat Products regularly and frequently over a period of many years.

8. Plaintiff suffered from Parkinson's caused by many years of regular, frequent, prolonged exposure to Defendants' Paraquat Products.

9. Plaintiff brings this case to recover from the Defendants the compensable damages he has suffered which were directly and proximately caused by his exposure to Defendants' Paraquat Products.

## B. Defendants

10. SYNGENTA CROP PROTECTION LLC is a Delaware limited liability company with its principal place of business in Greensboro, North Carolina. SYNGENTA CROP PROTECTION LLC is a subsidiary of Defendant SYNGENTA A G.

11. SYNGENTA AG is a foreign corporation organized and existing under the laws of Switzerland with its principal place of business in Basel, Switzerland.

12. CHEVRON U.S.A., Inc. ("CHEVRON USA") is a Pennsylvania corporation with its principal place of business in San Ramon, California. CHEVRON USA is an indirect wholly owned subsidiary of CHEVRON CORPORATION.

13. At times in this Complaint, SYNGENTA and SYNGENTA CROP PROTECTION LLC are collectively referred to as "SYNGENTA" or "SYNGENTA DEFENDANTS."

14. From approximately May 1964 through approximately June 1981, Imperial Chemical Industries Limited ("ICI Limited") and certain ICI Limited subsidiaries, each of which was a predecessor of Defendants SYNGENTA AG and/or SYNGENTA CROP, were engaged, directly, acting in concert with each other, and/or acting in concert with CHEVRON, in the business of developing, registering, manufacturing, distributing, and selling paraquat for use as an active ingredient in Paraquat Products, and developing, registering, formulating, and distributing Paraquat Products, for sale and use in the U.S., including Louisiana ("the U.S. paraquat business").

15. From approximately June 1981 through approximately September 1986, Imperial Chemical Industries PLC ("ICI PLC") and certain ICI PLC subsidiaries, each of which was a predecessor of Defendant SYNGENTA AG and/or SYNGENTA CROP, were engaged directly, acting in concert with each other, and/or acting in concert with Defendant CHEVRON, in the business of developing, registering, manufacturing, distributing, and selling paraquat for use as an active ingredient in Paraquat Products, and developing, registering, formulating, and distributing Paraquat Products, for sale and use in the U.S., including Louisiana ("the U.S. paraquat business").

16. From approximately May 1964 through approximately September 1986, Chevron Chemical Company, a predecessor of Defendant CHEVRON USA was engaged, directly and/or acting in concert with ICI, in all aspects of the U.S. paraquat business.

17. Between approximately May 1964 and approximately September 1986, ICI manufactured and sold paraquat to CHEVRON ("CHEVRON paraquat") for use by Chevron Defendants, and others to which CHEVRON distributed it, as an active ingredient in Paraquat Products that Chevron Defendants and others formulated and distributed for sale and use in the U.S., including Louisiana ("CHEVRON Paraquat Products").

18. From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SYNGENTA CROP) initially, then other SYNGENTA AG predecessors and certain subsidiaries of each (including predecessors of SYNGENTA CROP), and most recently SYNGENTA AG and certain SYNGENTA AG subsidiaries (including SYNGENTA CROP), have been engaged, directly and/or acting in concert with each other, in all aspects of the U.S. paraquat business.

19. From approximately September 1986 through the present, ICI PLC and certain ICI PLC subsidiaries (including predecessors of SYNGENTA CROP) initially, then other SYNGENTA AG predecessors and certain subsidiaries of each (including

predecessors of SYNGENTA CROP), and most recently SYNGENTA AG and certain SYNGENTA AG subsidiaries (including SYNGENTA CROP), have manufactured paraquat ("ICl-SYNGENTA paraquat") for their own use, and for use by others to which they distributed it, as an active ingredient in Paraquat Products that SYNGENTA CROP and its predecessors and others have distributed for sale and use in the U.S., including Louisiana ("!Cl-SYNGENTA Paraquat Products")

20. SYNGENTA CROP is registered to do business in the State of Louisiana, with its registered agent office in Baton Rouge, Louisiana.

21. SYNGENTA CROP does substantial business with respect to the Paraquat Products in the State of Louisiana, including Parishes within the Eastern District of Louisiana, including the following:

   a. markets, advertises, distributes, sells, and delivers paraquat to distributors, dealers, applicators, and farmers in the State of Louisiana, including the Eastern District of Louisiana.

   b. secures and maintains the registration of paraquat and other pesticides with the EPA and the Louisiana Department of Agriculture to enable itself and others to manufacture, distribute, sell, and use the Paraquat Products in the State of Louisiana, including Parishes within the Eastern District of Louisiana; and

   c. performs, hires others to perform, and funds or otherwise sponsors or otherwise funds the testing of paraquat in the State of Louisiana, including Parishes within the Eastern District of Louisiana.

22. SYNGENTA AG is a foreign corporation organized and existing under the laws of Switzerland, with its principal place of business in Basel, Switzerland.

23. SYNGENTA AG is a management holding company that owns stock or other ownership interests, either directly or indirectly, in other Syngenta Group companies, including SYNGENTA CROP.

24. SYNGENTA CROP PROTECTION AG, a Swiss corporation with its principal place of business in Basel, Switzerland, is one of SYNGENTA AG's direct, wholly-owned subsidiaries.

25. SYNGENTA CROP PROTECTION AG employs the global operational managers of production, distribution and marketing for the Syngenta Group's Crop Protection Division.

26. SYNGENTA CROP PROTECTION AG is the "nerve center" through which SYNGENTA AG manages the entire Syngenta Group.

27. SYNGENTA CROP PROTECTION AG employs the "Heads" of the Syngenta Group's CP and Seeds Divisions.

28. SYNGENTA CROP PROTECTION AG also employs the "Heads" and senior staff of various global functions of the Syngenta Group, including Human Resources, Corporate Affairs, Global Operations, Research and Development, Legal and Taxes, and Finance.

29. Virtually all of the Syngenta Group's global "Heads" and their senior staff are housed in the same office space in Basel, Switzerland.

30. SYNGENTA AG is the indirect parent of SYNGENTA CROP through multiple layers of corporate ownership.

31. Before SCPI was converted to SYNGENTA CROP, it was incorporated in Delaware, had its principal place of business in North Carolina, and had its own board of directors.

32. SYNGENTA CROP's sales accounted for more than 47% of the sales for the entire Syngenta Group in 2019.

33. SYNGENTA CROP does substantial business in the State of Louisiana, including Parishes within this United States District of Louisiana Court, and it markets, advertises, distributes, sells, and delivers Paraquat to users in the State of Louisiana, including Parishes within this District Court.

34. SYNGENTA CORPORATION does substantial business in the State of Louisiana, including Parishes within this United States District of Louisiana Court, and it markets, advertises, distributes, sells, and delivers Paraquat to distributors, dealers, and end users in the State of Louisiana.

35. YNGENTA CROP PROTECTION LLC is registered to do business in the State of Louisiana, with its registered agent office in Baton Rouge, Louisiana.

36. SYNGENTA CORPORATION is registered to do business in the State of Louisiana, with its registered agent office in Baton Rouge, Louisiana.

**II.**   **Chevron Defendants**

37. Chevron Chemical Company was a corporation organized in 1928 under the laws of the State of Delaware.

38. In 1997, Chevron Chemical Company was merged into Chevron Chemical Company LLC, a limited liability company organized under the laws of the State of Delaware.

39. Defendant CHEVRON USA is a corporation domiciled in Delaware, organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business in San Ramon, California.

40. CHEVRON USA is registered to do business in Louisiana, with the office of its registered agent in Baton Rouge, Louisiana.

41. CHEVRON USA is an indirect, wholly owned subsidiary of CHEVRON CORPORATION.

42. In the mid-2000s, CHEVRON USA entered into an agreement in which it expressly assumed the liabilities of Chevron Chemical Company and Chevron Chemical Company LLC arising from Chevron Chemical's then-discontinued agrichemical business, which included the design, registration, manufacture, formulation, packaging, labeling, distribution, marketing, and sale of Paraquat Products in the United States as alleged in this Complaint.

## JURISDICTION & VENUE

43. This Court has subject matter jurisdiction over this action because diversity jurisdiction exists under 28 U.S.C. § 1332(a)(3).

44. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, because Plaintiff seeks an amount that exceeds this sum or value on each of her claims against each Defendant.

45. Complete diversity exists because this is an action between citizens of different states in which a citizen or subject of a foreign state is an additional party, in that:

   a. Plaintiff is a citizen of the State of Louisiana;

   b. SYNGENTA AG is a citizen of Switzerland;

   c. SYGENTA CROP PROTECTION LLC is a citizen of the States of Delaware and North Carolina;

   d. CHEVRON USA is a citizen of the States of Delaware and Texas;

## FACTS

### A. Overview of Paraquat

46. Defendants' Paraquat Products have been used in the U.S. to kill broadleaf weeds and grasses before the planting or emergence of more than 100 field, fruit, vegetable, and plantation crops, to control weeds in orchards, and to desiccate (dry) plants before harvest. At all relevant times, the use of Defendants' Paraquat Products for these purposes was intended or directed by or reasonably foreseeable to and was known to or foreseen by Defendants.

47. Defendants' Paraquat Products were commonly used multiple times per year on the same ground, particularly when used to control weeds in orchards and in farm fields where multiple crops are planted in the same growing season or year. At all relevant times, the use of Defendants' Paraquat Products in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by Defendants.

48. Defendants' Paraquat Products were typically sold to end users in the form of liquid concentrates that were then diluted with water in the tank of a sprayer and applied by spraying the diluted product onto target weeds. At all relevant times, the use of Defendants' Paraquat Products in this manner was intended or directed by or reasonably foreseeable to, and was known to or foreseen by the Defendants.

49. Knapsack sprayers, hand-held sprayers, aircraft (i.e., crop dusters), trucks with attached pressurized tanks, and tractor-drawn pressurized tanks, were commonly used to apply Defendants' Paraquat Products. At all relevant times, the use of such equipment for that purpose was intended or directed by or reasonably foreseeable to, and was known to or foreseen by, the Defendants.

50. When Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by, the Defendants, persons who used them and others nearby were commonly exposed to paraquat while it was being mixed and loaded into the tanks of sprayers, including as a result of spills, splashes, and leaks. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by Defendants that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

51. When Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants persons who sprayed them, and others nearby while they were being sprayed or when they recently had been sprayed, commonly were exposed to paraquat, including as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind) and contact with sprayed plants. At all relevant times, it was reasonably foreseeable to, and known to or foreseen by Defendants that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

52. When Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants, persons who used them and other persons nearby commonly were exposed to paraquat, including as a result of spills, splashes, and leaks, while equipment used to spray it was being emptied or cleaned or clogged spray nozzles, lines, or valves were being cleared. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that such exposure commonly would and did occur and would and did create a substantial risk of harm to the persons exposed.

53. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat could and did enter the human body via absorption through or penetration of the skin, mucous membranes, and other epithelial tissues, including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage was present, and that paraquat that entered the human body in one or more of these ways would and did create a substantial risk of harm to people so exposed.

54. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat could and did enter the human body via respiration into the lungs, including the deep parts of the lungs where respiration (gas exchange) occurs, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

55. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat could and did enter the human body via ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways, and that paraquat that entered the human body in this way would and did create a substantial risk of harm to people so exposed.

56. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat that entered the human body via ingestion into the digestive tract could and did enter the enteric nervous system (the part of the nervous system that governs the function of the gastrointestinal tract), and that paraquat that entered the enteric nervous system would and did create a substantial risk of harm to people so exposed.

57. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat that entered the human body, whether via absorption, respiration, or ingestion, could and did enter the bloodstream, and that paraquat that entered the bloodstream would and did create a substantial risk of harm to people so exposed.

58. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants, and people were exposed to paraquat as a result, paraquat that entered the bloodstream could and did enter the brain, whether through the blood-brain barrier or parts of the brain not protected by the blood-brain barrier, and that paraquat that entered the brain would and did create a substantial risk of harm to people so exposed.

59. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to paraquat as a result, paraquat that entered the nose and nasal passages could and did enter the brain through the olfactory bulb (a part of the brain involved in the sense of smell), which is not protected by the blood-brain barrier, and that paraquat that entered the olfactory bulb would and did create a substantial risk of harm to people so exposed.

60. At all relevant times, it was reasonably foreseeable to, and was known to or foreseen by Defendants that when Defendants' Paraquat Products were used in a manner that was intended and directed by or reasonably foreseeable to, and was known to or foreseen by Defendants and people were exposed to Paraquat Products that contained surfactants or had surfactants added to them, the surfactants would and did increase the toxicity of paraquat toxicity to humans by increasing its ability to stay in contact with or penetrate cells and cellular structures, including but not limited to the skin, mucous membranes, and other epithelial and endothelial tissues, including tissues of the mouth, nose and nasal passages, trachea, conducting airways, lungs, gastrointestinal tract, blood-brain barrier, and neurons, and that this would and did increase the already substantial risk of harm to people so exposed.

## C. Overview of Parkinson's

61. Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system, the part of the central nervous system that controls movement.

62. Scientists who study Parkinson's disease generally agree that fewer than 10% Of all Parkinson's disease cases are caused by inherited genetic mutations alone, and that more than90% are caused by a combination of environmental factors, genetic susceptibility, and the aging process.

63. The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

64. Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

65. Non-motor symptoms-such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression-are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

66. There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression, and the treatments most commonly prescribed for its motor symptoms tend to become progressively less effective, and to cause unwelcome side effects, the longer they are used.

67. The selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc") is one of the primary pathophysiological hallmarks of Parkinson's disease.

68. Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

69. The death of dopaminergic neurons in the SNpc decreases the production of dopamine

70. Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

71. The presence of Lewy bodies (insoluble aggregates of a protein called alpha-synuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

72. Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

73. Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in-if not the precipitating cause of-the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of Parkinson's disease.

## D. Dangers of Paraquat

74. Paraquat is highly toxic to both plants and animals because it causes and contributes to the degeneration and death of living cells.

75. Paraquat causes and contributes to the degeneration and death of plant and animal cells both directly, through oxidation, and indirectly, through oxidative stress created or

aggravated by the "redox cycling" of paraquat; these processes damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells, and interfere with cellular functions-in plant cells, with photosynthesis, and in animal cells, with cellular respiration-that are essential to cellular health.

76. In both plant and animal cells, paraquat undergoes redox cycling that creates or aggravates oxidative stress because of the "redox properties" inherent in paraquat's chemical composition and structure: paraquat is both a strong oxidant and has a high propensity to undergo redox cycling, and to do so repeatedly, in the presence of a suitable reductant and molecular oxygen, both of which are present in all living cells.

77. The redox cycling of paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can and often does initiate a cascading series of chemical reactions that can and often do create other reactive oxygen species that damage lipids, proteins, and nucleic acids, molecules that are essential components of the structures and functions of living cells.

78. Because the redox cycling of paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of paraquat can trigger the production of countless molecules of destructive superoxide radical. After even a tiny amount of paraquat enters the human brain, paraquat molecules continue to undergo redox cycling and continue to cause damage to human brain cells. This repeated cycling continues in the presence of oxygen and continues to cause the death of dopaminergic neurons, eventually resulting in the onset of Parkinson's disease. However, even after the onset of Parkinson's disease, the redox cycling continues to cause brain cell damage and death for as long as the victim lives.

79. The oxidation and redox potentials of paraquat have been known to science since at least the 1930s, and in the exercise of ordinary care should have been known, and were known, to Defendants at all relevant times.

80. That paraquat is highly toxic to all living cells-both plant cells and all types of animal cells-has been known in the scientific community since at least the mid-1960s, and in the exercise of ordinary care should have been known, and was known Defendants at all relevant times.

81. The high toxicity of paraquat to living cells of all types creates a substantial risk of harm to persons exposed to paraquat, which Defendants should have known in the exercise of ordinary care, and did know, at all relevant times.

82. The same oxidation and redox potentials that make paraquat highly toxic to plant cells and other types of animal cells make paraquat highly toxic to nerve cells, including dopaminergic neurons, and create a substantial risk of neurotoxic harm to persons exposed to paraquat. Defendants should have known this in the exercise of ordinary care, and did know this, at all relevant times.

### H. Plaintiffs Use of Paraquat & Diagnosis of Parkinson's

83. Decedent, Robert J. Scafidel, was repeatedly exposed to and inhaled, ingested, or absorbed paraquat in the course of applying Paraquat Products, including Gramaxone. Plaintiff was a high school sports coach that tended to the fields. Plaintiff also has acreage on the Northshore of Louisiana where he used weed killer.

84. On information and belief during this time period, Defendants manufactured and sold the paraquat that the owners or operators of farms and governmental entities applied or had applied on land in and around St. Tammany and St. Bernard Parishes, Louisiana.

85. After repeated and consistent paraquat exposure, Plaintiff began suffering neurological injuries consistent with Parkinson's disease and was diagnosed with Parkinson's disease in or about 2012 exhibiting some symptoms of the disease years earlier. Plaintiffs neurological injuries have continued and progressed over time, and Plaintiff suffers these injuries at present and will continue to suffer these injuries into the future.

86. Each of the Defendants knew or should have known of the risk of neurological injuries to persons who used paraquat, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed and fraudulently concealed said risk.

87. Before the year 2021, Plaintiff did not know nor had any reason to know of the association between Parkinson's disease and exposure to paraquat or Paraquat Products

88. No doctor or any other person told Plaintiff before the year 2021 that his injuries were or could have been caused by exposure to paraquat.

89. Before the year 2021, Plaintiff had never read, viewed, or heard of any articles in newspapers, scientific journals, or other publications that associated Parkinson's disease with paraquat.

90. Before the year 2021, Plaintiff had never read, viewed, or heard of any lawsuit alleging that paraquat causes Parkinson's disease.

91. At no time when using paraquat himself was Plaintiff aware that exposure to paraquat could cause any latent injury, including any neurological injury or Parkinson's disease, or that any precautions were necessary to prevent any latent injury that could be caused by exposure to paraquat.

92. The paraquat to which Plaintiff was exposed was sold and used in Louisiana, and was manufactured, distributed, and/or sold by one or more of the Defendants and their corporate predecessors and others with whom they acted in concert intending or expecting that it would be sold and used in Louisiana.

93. On information and belief, Plaintiff was exposed to Paraquat Products that were sold and used in Louisiana, and were designed, manufactured, distributed, and/or sold by the SYNGENTA DEFENDANTS, their corporate predecessors, and others with whom they acted in concert, intending or expecting that it would be sold and used in Louisiana.

94. On information and belief, Plaintiff was exposed to Paraquat Products that were sold and used in Louisiana, and were designed, manufactured, distributed, and/or sold by the CHEVRON DEFENDANTS, and others with whom they acted in concert, intending or expecting that it would be sold and used in Louisiana.

## **CAUSES OF ACTION**

### **COUNT I. NEGLIGENCE**

95. Plaintiff repeats, reiterates, and re-alleges every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

96. Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Paraquat into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

97. Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Paraquat into interstate commerce in that Defendants knew or should have known that using Paraquat created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of PD, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

98. The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

   a. Manufacturing, producing, promoting, formulating, creating, and/or designing Paraquat without thoroughly testing it;

   b. Failing to test Paraquat and/or failing to adequately, sufficiently, and properly test Paraquat;

c.  Not conducting sufficient testing programs to determine whether or not Paraquat was safe for use; in that Defendants herein knew or should have known that Paraquat was unsafe and unfit for use by reason of the dangers to its users;

d.  Not conducting sufficient testing programs and studies to determine Paraquat's neurodegenerative properties even after Defendants had knowledge that Paraquat is, was, or could be neurodegenerative;

e.  Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Paraquat, and the propensity of these ingredients to render Paraquat toxic, increase the toxicity of Paraquat, whether these ingredients are neurodegenerative , magnify the neurodegenerative properties of Paraquat, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.  Negligently failing to adequately and correctly warn the Plaintiff, the public, the medical and agricultural professions, and the EPA of the dangers of Paraquat;

g.  Negligently failing to petition the EPA to strengthen the warnings associated with Paraquat;

h.  Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Paraquat;

i.  Negligently marketing, advertising, and recommending the use of Paraquat without sufficient knowledge as to its dangerous propensities;

> j.  Negligently representing that Paraquat had equivalent safety and efficacy as other forms of herbicides;
>
> k.  Negligently manufacturing Paraquat in a manner, which was dangerous to its users;
>
> l.  Negligently producing Paraquat in a manner, which was dangerous to its users;
>
> m. Negligently formulating Paraquat in a manner, which was dangerous to its users;
>
> n. Negligently formulating Paraquat in a manner, which was dangerous to its users;
>
> o. Concealing information from the Plaintiff while knowing that Paraquat was unsafe, dangerous and/or non-conforming with EPA regulations; and
>
> p. Improperly concealing and/or misrepresenting information from the Plaintiff, scientific and medical professionals and/or the EPA, concerning the severity of risks and dangers of Paraquat compared to other forms of herbicides;
>
> q. Negligently selling Paraquat with a false and misleading label.

99. Defendants under-reported, underestimated, and downplayed the serious dangers of Paraquat.

100. Defendants negligently and deceptively compared the safety risks and/or dangers of Paraquat with common everyday foods such as table salt, and other forms of herbicides.

101. Even though Defendants knew or should have known that Paraquat caused, or could cause, unreasonably dangerous side effects, Defendants continued and continues to market, manufacture, distribute, and/or sell Paraquat to consumers, including the Plaintiff.

102. Defendants knew or should have known that consumers such as the Plaintiff would foreseeably suffer injury due to Defendants' failure to exercise ordinary care, as set forth above.

103. As a result of the foregoing acts and omissions, the Plaintiff suffered from serious

and dangerous side effects including, but not limited to, PD, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, and financial expenses for hospitalization and medical care. Further, Plaintiff suffered life-threatening PD, and severe personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

## COUNT II. MANUFACTURING AND DESIGN DEFECT UNDER RS 9:2800.55 AND LSA-RS 9:2800.56 OF THE LOUISIANA PRODUCTS LIABLITY ACT (LPLA)

104.    Plaintiff repeats, reiterates, incorporates, and realleges every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

105.    Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, testing, advertisement, supply, promotion, packaging, sale, and distribution of Paraquat including the duty to take all reasonable steps necessary to manufacture and sell a product that was not defective and unreasonably dangerous to consumers and users of the product.

106.    Defendants failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of Paraquat because Defendants knew, or should have known, that exposure to Paraquat was linked to Parkinson's Disease, and was therefore not safe for use by consumers.

107.    Defendants continued to manufacture and market its product despite the knowledge, whether direct or ascertained with reasonable care, that Paraquat posed a serious risk of bodily harm to consumers.

108.    Defendants knew, or should have known, that consumers such as Plaintiff would foreseeably suffer injury because of Defendants' failure to exercise ordinary care. The

characteristic of the product that renders it unreasonably dangerous existed at the time the product left the control of Defendants.

109. Paraquat was expected to, and did, reach the intended consumers, handlers, and persons coming in contact with the product with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Defendants.

110. Paraquat was manufactured, designed, marketed, labeled and sold in a defective condition, for use by Plaintiff and all other consumers of the product, making the product unreasonably dangerous.

111. Paraquat as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and formulation in that when it left the hands of the manufacturers, suppliers, and distributors, the foreseeable risks of harm caused by the product exceeded the claimed benefits of the product.

112. Paraquat, as designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design and formulation because when it left the hands of Defendants, the product was unreasonably dangerous and was also more dangerous than expected by the ordinary consumer.

113. At all times relevant to this action, Defendants knew and had reason to know that Paraquat was inherently defective and unreasonably dangerous as designed, formulated, and manufactured by Defendants, and when used and administered in the form manufactured and distributed by Defendants, and in the manner instructed by Defendants to be used by Plaintiff and other consumers.

114. Plaintiff used Paraquat for the purpose intended by Defendants, and in a manner normally intended to be used. Defendants had a duty to design, create, and manufacture products that were reasonably

dangerous for their normal, common, and intended use. Defendants' product was not reasonably fit, suitable, or safe for its anticipated use, and safer, reasonable alternative designs existed and could have been utilized. at the time the product left his control:

115.   In light of then-existing reasonably available scientific and technological knowledge, Defendants could have known of the design characteristic that caused the damage or the danger of such characteristic.

116.   Reasonably prudent manufacturers would not have placed the product in the stream of commerce with knowledge of these design flaws.

117.   Defendants designed, developed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product that created an unreasonable risk of serious harm to the health, safety, and well-being of Plaintiff and other consumers. Defendants is therefore liable for Plaintiff's injuries and damages sustained proximately caused by Plaintiff's use of the product, as Defendants' product unreasonably dangerous, and all damage arose from the reasonably anticipated use of the product by the Plaintiff.

118.   Plaintiff could not, by the exercise of reasonable care, discover the defective condition of Defendants' product and/or perceive its defective dangers prior to its use.

119.   Paraquat was a substantial, proximate, and contributing factor in causing Plaintiff's injuries.

120.   As a proximate result of Defendants' acts and omissions and Plaintiff's use of Defendants' defective product, Plaintiff suffered serious physical injuries and incurred substantial medical costs and expenses to treat and care for his injuries described in this Complaint, including, but not limited to, the following:

  a.  Plaintiff required and will continue to require healthcare and services;

b.  Plaintiff incurred and will continue to incur medical and related expenses; and

c.  Plaintiff suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

## COUNT III. INADEQUATE WARNING UNDER LSA-RS-9:2800.57

121. Plaintiff repeats, reiterates, incorporates, and realleges every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

122. Defendants designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed Paraquat.

123. Because it is unlawful to sell a pesticide that is registered but nevertheless misbranded, manufacturers have a continuing obligation to adhere to FIFRA's labeling requirements. 7 U.S.C. § 136j(a)(1)(E), § 136a(f)(2), § 136a(f)(1).

124. Paraquat was expected to, and did, reach the intended consumers, handlers, and persons not applying but exposed to the product in the course of its expected and foreseeable use, all with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Paraquat.

125.     Paraquat was manufactured, designed, marketed, labeled and sold in a defective condition, for use by Plaintiff and all other consumers of the product, making the product unreasonably dangerous.

126.     Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce Paraquat and in the course of same, directly advertised or marketed the product

To consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of its product.

127.     Paraquat, as designed, researched, developed, manufactured, tested, advertised, promoted, marketed, sold, labeled, and distributed by Defendants, was defective due to the product's inadequate warnings and instructions. Defendants knew, or should have known, and adequately warned that its product created a risk of serious and dangerous side effects, including but not limited to, Parkinson's Disease.

128.     The product was under the exclusive control of Defendants and was unaccompanied by appropriate and adequate warnings regarding the risk of severe and permanent injuries associated with its use, including, but not limited to, the risk of developing Parkinson's Disease. The warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer.

129.     Notwithstanding Defendants' knowledge of the defective condition of its product, Defendants failed to adequately warn the medical community and consumers of the product, including Plaintiff and his healthcare providers, of the dangers and risk of harm associated with the use of Paraquat.

130.     Defendants downplayed the serious and dangerous side effects of its product to encourage sales of the product, particularly without the use of protective equipment; consequently, Defendants placed its profits above its customers' safety.

131.     The product was defective when it left the possession of Defendants in that it contained insufficient warnings to alert Plaintiff to the dangerous risks associated with it, including the risk of Parkinson's Disease.

132.     Even though Defendants knew or should have known of the risks and reactions associated with their product, it still failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

133.     Plaintiff used Paraquat as intended or in a reasonably foreseeable manner

134.     Each Defendant individually, as a manufacturer of agricultural products, is held to

the level of knowledge of an expert in the field and, further, Defendants had knowledge of

the dangerous risks and side effects of its product.

135.     Plaintiff did not have the same knowledge as Defendants and no adequate warning

was communicated to Plaintiff or any other consumers.

136.     Defendants had a continuing duty to warn consumers, including Plaintiff, of the

dangers associated with its product, and by negligently and/or wantonly failing to adequately

warn of the dangers of the use of its product, Defendants breached its duty.

137.     Although Defendants knew, or should have known, of the defective nature of

Paraquat it continued and continues to design, manufacture, market, and sell its product without

providing adequate warnings and instructions concerning the use of its product so as to

maximize sales and profits at the expense of the public health and safety, in knowing,

conscious, and deliberate disregard of the foreseeable harm caused by Paraquat.

138.     As a direct and proximate result of Defendants' failure to adequately warn or

other acts and omissions of Defendants described herein, Plaintiff suffered severe and

permanent injuries, pain, and mental anguish, including diminished enjoyment of life.

139.     Defendants' failure to warn extended beyond the product's label and into other media

available to Defendants, including but not limited to advertisements, person-to-person sales

calls, medical journal articles, and medical conference presentations.

140.     Paraquat, upon information and belief, as manufactured by Defendants, was further

defective due to inadequate post-market warnings or instructions because after Defendants

knew, or should have known, of the risk of serious bodily harm from the use of Paraquat,

Defendants failed to provide adequate warnings to consumers about the product,

knowing the product could cause serious injury.

141. Paraquat, upon information and belief, as manufactured and supplied by Defendants, was unreasonably dangerous because an adequate warning about the product was not been provided if, as at the time the product left Defendants' control, the product possessed the aforementioned characteristics that may cause damage users such as Plaintiff, and Defendants failed to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product.

142. After Defendants had started shipping product that had left its control, Defendants acquired knowledge of characteristics of the product that might cause damage and the danger of such characteristic, and is liable for damage caused by a subsequent failure to use reasonable care to provide an adequate warning of such characteristic and its danger to users and handlers of the product since that knowledge of the characteristics and its danger to users was acquired.

143. A reasonably prudent manufacturer would have warned of these characteristics and its danger to users, and Defendants' failure to do so renders it liable for all damages caused by its subsequent failure to use reasonable care to provide adequate warning of the danger to Plaintiff and other users of the product.

144. As a proximate result of Defendants' acts and omissions and Plaintiff's use of Paraquat, Defendants' defective product, Plaintiff suffered serious physical injuries and incurred substantial medical costs and expenses as set forth in this Complaint, including, but not limited to, the following:

   a. Plaintiff required and will continue to require healthcare and services;

   b. Plaintiff incurred and will continue to incur medical and related expenses; and

   c. Plaintiff suffered and will continue to suffer mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, and other losses and damages.

## COUNT IV. NON-CONFORMITY TO EXPRESS WARRANTY
## UNDER LSA-RS-9:2800.58

145. Plaintiff repeats, reiterates, incorporates, and realleges every allegation contained in this Complaint with the same force and effect as if fully set forth herein, Plaintiff incorporates all allegations in the preceding paragraphs as if fully set forth herein and further alleges:

146. At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert were engaged in the business of designing, manufacturing, distributing, and selling Paraquat Products and held themselves out as having knowledge or skill regarding Paraquat Products.

147. At all times relevant to this claim, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert designed, manufactured, distributed, and sold Paraquat Products intending or expecting that it would be sold and used in Louisiana.

148. At the time of each sale of Paraquat Products to which Plaintiff was exposed, Defendants, Defendants' corporate predecessors, and others with whom they acted in concert impliedly warranted that it was of merchantable quality, including that it was fit for the ordinary purposes for which such goods were used, when it was not of merchantable quality.

149. Defendants, through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisements, expressly warranted that Paraquat was safe and effective and fit for use by consumers, was of merchantable quality, did not create the risk of or produce dangerous side effects, including, but not limited to, Parkinson's Disease and was adequately tested and fit for its intended use.

150. Paraquat, as manufactured and sold by Defendants, did not conform to these representations because it caused serious injury, including Parkinson's Disease, to consumers such as Plaintiff, when used as directed by the product label.

151. Defendants breached their express warranties because their product was and is defective for their intended purpose.

152. Plaintiff did rely on Defendants' express warranties regarding the safety and efficacy of their product in purchasing and using the product, and induced Plaintiff to use the product, and Plaintiff's damages were proximately caused by the untruthfulness of the express warranty.

153. As a foreseeable, direct, and proximate result of the breach of the express warranties, Plaintiff suffered severe and permanent personal injuries, harm, and economic loss.

## PRAYER FOR RELIEF

**WHEREFORE**, regarding each cause of action set forth above, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and causes of action and as follows:

154. Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other noneconomic damages in an amount to be determined at trial of this action;

155. Awarding compensatory damages to Plaintiff for past and future damages, including, but not limited to, Plaintiff's pain and suffering and for severe and permanent personal injuries sustained by Plaintiff including health care costs and economic loss;

156. Awarding Punitive damages for defendants' conduct;

157. Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action.

1. Pre judgment interest;

2. Post judgment interest;

3. Awarding Plaintiff's reasonable attorneys' fees;

4. Awarding Plaintiff the costs of these proceedings; and

5. Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury as to all issues.

Respectfully Submitted,

**MARTZELL BICKFORD & CENTOLA**

*/s/ Lawrence J. Centola, III*
**LAWRENCE J. CENTOLA, III (#27402)**
338 Lafayette Street
New Orleans, Louisiana 70130
(504) 581-9065
(504) 581-7635 (Fax)

**COUNSEL FOR PETITIONER**